HELVERING, Commissioner of Internal Revenue, v. SMITH.

No. 329.

Circuit Court of Appeals, Second Circuit.

June 7, 1937.

James W. Morris, Asst. Atty. Gen., and Sewall Key and Charles A. Horsky, Sp. Assts. to the Atty. Gen., for appellant.

Kirlin, Campbell, Hickox, Keating & Mc-Grann, of New York City (James R. Roberts and H. Maurice Fridlund, both of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

The Commissioner appeals from a ruling by the Board of Tax Appeals, allowing the taxpayer to compute his tax under section 101 (a) of the Revenue Act of 1928, 26 U.S.C.A. § 101 note; that is to say, holding that the transaction involved resulted in a "capital net gain," section 101 (c) (5), 26 U.S.C.A. § 101 note, derived from the sale of "capital assets," section 101 (c) (8), 26 U.S.C.A. § 101 note. This issue arose from the following situation. The taxpayer, on January 1, 1925, had become a member of a firm of attorneys in New York City, and so continued until December 31, 1929, when he retired, and the firm was dissolved. The firm property consisted of furniture and fittings such as lawyers use, and a law library; but chiefly of accounts receivable, some of which had been "billed" to clients, and some of which were for services rendered, not yet ripe for collection. The articles provided that upon dissolution—which might be at the will of any partner—the majority of those remaining should liquidate the firm, and that any retiring partner should "not be entitled to any part of any earnings * * * for services performed after such dissolution, but * * * to receive in full satisfaction * * * only such partner's due proportion of all earnings actually collected * * * and * * * of all earnings * * * for services performed." "The lease * * * and all furniture and fittings and all records, * * * and the law library" were to belong to those who continued the business, and the retiring partner got nothing for his share in the good-will. The taxpayer, who, like the firm, filed his returns upon a cash basis, released his partners from all liability for a cash payment of $125,000, which recited that he had received "all earnings * * * actually collected prior to said dissolution" and that "the amount of his proportion of said earnings received after such dissolution for services performed prior thereto has been estimated at the sum of $125,000." He had contributed nothing to the firm when he entered it five years before.

The cause was tried upon a stipulation which declared that the remaining partners had orally agreed that "they would purchase his interest in the firm for a lump sum of $125,000" which was "carried out" when he "retired from the firm and received * * * payment of said $125,000 of which documentary proof is to be submitted at the hearing." The stipulation spoke of this transaction as a "Sale of Partnership Interest." The Board adopted the taxpayer's theory that his interest in the firm was merely a claim against it as an entity, and that, as he had held it for more than two years, it was "capital assets," section 101 (c) (8), 26 U.S.C.A. § 101 note. The Commissioner insisted that the claim was all income, and the payment merely an immediate liquidation of future income.

The Uniform Partnership Act which is the law of New York (Partnership Law N.Y. [Consol.Laws N.Y. c. 39]), did not, as the taxpayer supposes, make the firm an independent juristic entity. The Commission did indeed start out to do so, and if Dean Ames had lived, considering his partiality for the mercantile conception of a partnership (Cory on Accounts, 1839), he might have succeeded in impressing that mould upon the act. But after his death, the Conference in 1911 after a very full discussion chose to retain the pluralistic notion of the firm, as the English chancellors had painfully worked it out from the bare common-law, which recognized only joint owners and joint obligors. Harris v. Commissioner (C.C.A.) 39 F.(2d) 546; Helvering v. Walbridge (C.C.A.) 70 F.(2d) 683. That was procedurally full of difficulties, and permitted some injustice, both of which it was the purpose of the Act to abate; but the essentials of the old model were preserved. Indeed, many of the supposed innovations were not such; for example, the limitation upon a partner's power to assign firm property (section 25 (2) (b) [Partnership Law N.Y. § 51 (2) (b)]), the declaration that his interest in it "is his share of the profit and surplus" (section 26 [Partnership Law N.Y. § 52]), and the extent of an assignee's interest acquired by the assignment, had all been law before, at least in some jurisdiction, as the Commissioners' notes bear witness. With this history before us, it would be a palpable perversion to understand the act as creating a new juristic person, which owned the firm property and was obligor of the firm

debts, against which the partners had only a chose in action, and to which they were liable as guarantors.

 Moreover, the Revenue Act gives no color to such a theory, but was framed on precisely the opposite plan. From the outset the tax had been imposed on the partners, and their taxable income has included their distributive shares, whether distributed, or not. It is true that when the distribution is of income, the tax upon it may be computed in disregard of the items which make it up; ignoring whether they may be the result of capital gains made by the firm. Johnston v. Commissioner, 86 F.(2d) 732 (C.C.A.2). In that case we held in substance that the distribution should be treated as an indivisible item of income, except so far as the statute expressly carried over its composite character, and allowed the partner to trace the several factors back into the firm transactions from which they resulted. So far indeed we did treat the share as though it was a payment by the firm; but we did not hold, and no court has held, so far as we can find, that the share is no more than a right of action against a juristic entity. Indeed, even if it were, it would still be necessary to look into the firm transactions to learn how far it was made up of capital, and how far of income; just as it is necessary when a company declares a dividend on shares. Once so much be conceded, it can make no difference that the distribution is a final dividend, instead of being paid in course. That cannot change its quality; a partner, having no initial capital contribution to amortize, receives all his distributions as income; whether it be a part of the winding up or while the business continues.

 But it is argued that the transaction was not merely the payment of a winding up dividend, but the purchase of the taxpayer's interest in the firm assets, and that as such it was a capital transaction. It is of course possible to measure the purchase price of a partner's interest by his former proportion of future firm profits for a period of years. In Hill v. Commissioner, 38 F.(2d) 165 (C.C.A.1), such a purchase was treated as a capital transaction, and Bull v. United States, 295 U.S. 247, 254, 55 S.Ct. 695, 697, 79 L.Ed. 1421, approved the decision and repeated the doctrine. However, that is quite a different transaction; the retiring or deceased partner is conceived as having an interest in the firm assets, and the payments are not limited to what he would be entitled to anyway upon an accounting, however they are computed. The articles at bar did not so provide; they gave the taxpayer no interest in future earnings as consideration for his surrender. The transaction was not a sale because he got nothing which was not his, and gave up nothing which was. Except for the "purchase" and release, all his collections would have been income; the remaining partners would merely have turned over to him his existing interest in earnings already made. As he kept his books on a cash basis, it is true that he would have been taxed only as he received the accounts in driblets, but he would have been taxed upon them as income. The "purchase" of that future income did not turn it into capital, any more than the discount of a note received in consideration of personal services. The commuted payment merely replaced the future income with cash. Indeed, this very situation was suggested in Bull v. United States, supra, 295 U.S. 247, at pages 256, 257, 55 S.Ct. 695, 698, 79 L.Ed. 1421, and dealt with as we say. Nobody would suggest that the sale of a declared dividend payable in the future turns the cash received into capital.

Order reversed; deficiency reinstated.